[Cite as *State v. Latimore*, 2011-Ohio-3562.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J.<br>Hon. Julie A. Edwards, J. |
| -vs- | |
| | Case No. 2010CA00226 |
| JAMES LATIMORE | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of
Common Pleas, Case No. 2010CR0167


JUDGMENT:                    Affirmed


DATE OF JUDGMENT ENTRY:      July 18, 2011


APPEARANCES:


For Plaintiff-Appellee          For Defendant-Appellant


JOHN D. FERRERO              ANTHONY KOUKOUTAS
PROSECUTING ATTORNEY,        116 Cleveland Ave. NW
STARK COUNTY, OHIO           Suite 808
                             Canton, Ohio 44702
By: KATHLEEN O. TATARSKY
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio 44702-1413

*Hoffman, J.*

{¶1} Defendant-appellant James Latimore appeals his conviction and sentence entered by the Stark County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS[1] AND CASE

{¶2} On January 24, 2010, Appellant was involved in a high speed pursuit involving members of the Canton Police Department. In the early morning hours, Officer Thomas Hastings of the Canton Police Department testified he responded to a call of "shots fired" at 1547 Robin Court S.E. Canton. When he saw the headlights of a vehicle coming towards him, he decided to pursue that vehicle and get the license plate number. Officer Hastings initiated a traffic stop, activating the sirens and lights of his vehicle, at which point the suspect vehicle "took off." Officer Hastings then became the lead vehicle in pursuit of the suspect vehicle.

{¶3} Officer Brandon Shackle testified he and his partner were the second vehicle in pursuit of the suspect vehicle. Officer Gary Premier joined the pursuit of the suspect vehicle. Hastings testified the suspect vehicle went off the roadway, and he then attempted to box in the vehicle. The suspect vehicle rammed his cruiser and tried to drive away on foot. Appellant ultimately exited the suspect vehicle, and tried to run away on foot. Officer Premier gave Appellant audible commands to stop, but Appellant continued. Officer Premier proceeded to taser Appellant and then placed him under arrest.

---

[1] A more complete recitation of the facts will be set forth as necessary in the disposition of Appellant's individual assigned errors.

{¶4} James Nosic testified at trial he and Appellant had been together consuming alcohol during the early morning hours of January 24, 2010, and Appellant was driving the vehicle they occupied the night in question. He testified he was drunk on the night in question.

{¶5} Appellant was indicted on four counts of felonious assault, in violation of R.C. 2903.11(A)(2), with four repeat violent offender specifications under 2941.149; one count of failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331B)(C)(5)(A)(II); one count of resisting arrest, in violation of R.C. 2921.33(C)(1), and one count of domestic violence, in violation of R.C. 2919.25(A).

{¶6} A jury trial commenced on July 1, 2010. Appellant was found guilty on three counts of felonious assault, one count of failure to comply with an order or signal of a police officer, and one count of resisting arrest. The trial court then found Appellant guilty of the three repeat violent offender specifications.

{¶7} The trial court proceeded to sentence Appellant to five years on each count of felonious assault, two years for the failure to comply charge, to be served consecutive to the terms for felonious assault, and sixty days for the resisting arrest charge, to be served concurrent to the other sentences, for a total prison term of seventeen years.

{¶8} Appellant now appeals, assigning as error:

{¶9} "I. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶10} "II. APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

**{¶11}** "III. THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO CONSECUTIVE SENTENCES."

I.

**{¶12}** In the first assignment of error, Appellant maintains his convictions for felonious assault and resisting arrest are against the manifest weight and sufficiency of the evidence.

**{¶13}** Our standard of reviewing a claim a verdict was not supported by sufficient evidence is to examine the evidence presented at trial to determine whether the evidence, if believed, would convince the average mind of the accused's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, superseded by State constitutional amendment on other grounds as stated in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

**{¶14}** The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight. Sufficiency of the evidence is a question for the trial court to determine whether the State has met its burden to produce evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury.

**{¶15}** Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a

manifest miscarriage of justice, *State v. Thompkins* (1997), 78 Ohio St.3d 387, 678 N.E.2d 541, 1997–Ohio–52, superseded by constitutional amendment on other grounds as stated by *State v. Smith,* 80 Ohio St.3d 89, 1997–Ohio–355, 684 N.E.2d 668. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." *State v. Thompkins,* supra, 78 Ohio St.3d at 387, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.

{¶16} Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which reads:

{¶17} "(A) No person shall knowingly do either of the following:

{¶18} "(1) Cause serious physical harm to another or to another's unborn;

{¶19} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶20} Appellant argues the record does not reflect he knowingly intended to cause or attempt to cause physical harm to the officers; rather, his actions indicate he

was merely attempting to flee the situation. Further, Appellant asserts the State has not demonstrated the officers sustained serious physical harm as a result of the incident.

{¶21} Appellant was also convicted of resisting arrest, in violation of R.C. 2921.33, which reads:

{¶22} "(C) No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another person if either of the following applies:

{¶23} "(1) The offender, during the course of or as a result of the resistance or interference, recklessly causes physical harm to a law enforcement officer by means of a deadly weapon;"

{¶24} Appellant maintains he was the victim of excessive force, rather than user of force during the arrest process.

{¶25} Officer Hastings testified at trial:

{¶26} "A. As soon as I hit my lights and sirens, he took off.

{¶27} "Q. Okay. Did you see any other cars behind you or did you know of any other cars behind you?

{¶28} "A. I knew the other cruisers were directly behind my car, Cruisers No. 40 and 43.

{¶29} "Q. Who was in Cruiser 40?

{¶30} "A. 40 was driven by Officer Shackle and Dendinger.

{¶31} "Q. Okay.

{¶32} "A. Which is our 2-man car.

{¶33} "Q. Okay.

{¶34} "A. And Officer Premier was in Car No. 43.

**{¶35}** "Q. Okay.

**{¶36}** "A. Those are the initial officers that were sent to the call.

**{¶37}** "Q. Okay.  So you end up being the lead officer in the chase?

**{¶38}** "A. That's correct.

**{¶39}** "* * *

**{¶40}** "A. I am in 37.  I pulled up here trying to block him in.

**{¶41}** "Car 40 actually followed him up on the grassy embankment.  43 actually, I guess, turned.

**{¶42}** "When I tried to block him in here, his car tires continued to spin.  He started turning this way, I came back out onto Eleventh Street.

**{¶43}** "That's when he rammed my cruiser spinning me around 180 degree so I was facing back westbound.

**{¶44}** "Q. Were you able to see where the Defendant went?

**{¶45}** "A. He continued to go eastbound.  As soon as I got hit, I got out of my vehicle and started chasing him on foot.

**{¶46}** "* * *

**{¶47}** "What did you see when you exited your car?

**{¶48}** "A. When I jumped out of my vehicle, I began to chase them.  They were already 50, 60 yards down the road.  His - -

**{¶49}** "Q. Okay, when you say them, who do you mean by them?

**{¶50}** "A. The Defendant and our other cruisers.

**{¶51}** "Q. Okay.  Was anyone out of their cars at that point?

{¶52} "A. At that point his car was coming to rest.  He had made it through the fence line with his vehicle, and it was actually sliding back down the hill.

{¶53} "Q. Where did it appear that he was trying to go?

{¶54} "A. He was trying to make it up to Route 30 in the vehicle.

{¶55} "Q. Okay.  And you said - - was he, I guess if Route 30 is north, was he north of the fence toward Route 30 or south of the fence toward Eleventh Street?

{¶56} "A. He was north of the fence line.  He went through the fence at several different points actually because his vehicle had struck a lot of the poles and the chain link fences that's there.

{¶57} "Q. Okay.  So you saw the vehicle coming back down coming to rest.

{¶58} "What did you see next?

{¶59} "A. I saw the Defendant exit the driver's side of the vehicle, and he immediately took off northbound on foot.

{¶60} "Q. Okay.  What did you do in response to that?

{¶61} "A. Myself and Officer Premier who was in Car 43, we chased him on foot. I was still probably another 20 feet behind them where Officers Dendinger and Shackle took the vehicle.

{¶62} "There was another suspect in the vehicle.

{¶63} "Q. Okay.  What color was the suspect who fled?

{¶64} "A. He was a black male.

{¶65} "Q. And what color was the suspect who was in the vehicle?

{¶66} "A. A white male.

{¶67} "Q. Okay.  He fled up on Route 30.  Where did you go?

**{¶68}** "A. We had chased him northbound onto Route 30. I called out that he was trying to run down Route 30.

**{¶69}** "He was on the eastbound side running east, and then he jumped the median which is a cement barrier; and he began running eastbound on the westbound side.

**{¶70}** "Q. All right. Did you see any traffic on Route 30 during this time?

**{¶71}** "A. There wasn't traffic that I saw or noticed that was coming towards us when I passed to go across Route 30.

**{¶72}** "While we were fighting with him on the westbound lane, there was definitely cars passing us.

**{¶73}** "Q. Okay. We will get to the west, fighting with him in the westbound lane.

**{¶74}** "A. Okay.

**{¶75}** "Q. When he fled up the hill to Route 30, did that give you any safety concerns at that point?

**{¶76}** "A. Yes.

**{¶77}** "Q. What were they?

**{¶78}** "A. Well, we didn't know - - we thought that this was an armed individual. We had a shots fired call at 1547. We didn't know if anybody was injured at that point.

**{¶79}** "He had struck several vehicles of ours putting us in danger; and if he made it up on the highways and got away, we believed that he still had a gun on him at that point.

**{¶80}** "Q. Okay. Now, you mentioned that he's running then down the, would be the westbound lane against oncoming traffic eastbound?

**{¶81}** "A. Correct.

**{¶82}** "Q. How far did he get?

**{¶83}** "A. Warner Road is, I believe, four blocks east of Renick.  We ended up fighting him; and when I looked over, we were over Warner Road bridge.

**{¶84}** "* * *

**{¶85}** "Q. Okay.  Was Officer Premier successful in Tasing the Defendant?

**{¶86}** "A. No, sir.

**{¶87}** "Q. What happened?

**{¶88}** "A. One of the probes missed him, and it went over the top of him; and then he immediately ran at Officer Premier, and they began to fight.

**{¶89}** "Q. Okay.  Which way was he running when he ran at Officer Premier?

**{¶90}** "A. Back southbound.

**{¶91}** "Q. Back southbound.

**{¶92}** "A. He was actually - -

**{¶93}** "The Court:  Let's stop a minute.

**{¶94}** "A. Okay.

**{¶95}** "The Court: Go ahead.

**{¶96}** "Q. Okay.  How far did he get?

**{¶97}** "A. I believe Officer Premier was actually in the roadway on Route 30, and he was up against the center or the far north wall of Route 30.

**{¶98}** "When Officer Premier missed him, he turned around and immediately came at him.

**{¶99}** "So they were almost fighting on Route 30 in the roadway.

{¶100} "Q. All right. What did you do - - what did you see Officer Premier do?

{¶101} "A. They were, they were connected arm in arm struggling basically. Looked like they were wrestling each other.

{¶102} "I approached them and tackled both of them to the ground.

{¶103} "Q. And when you got them to the ground, what did you do?

{¶104} "A. We continued to fight. He wouldn't stop fighting.

{¶105} "We delivered several strikes to his midsection, anywhere we could get him to stop trying to fight with us.

{¶106} "Q. And where were you in relation to the roadway on Route 30?

{¶107} "A. We were in the - - on the berm of the road.

{¶108} "Q. And were you eventually successful in subduing the Defendant?

{¶109} "A. Yes. After several minutes of fighting, we got him handcuffed.

{¶110} "Q. All right. And where did you put his hands?

{¶111} "A. We put his hands behind him.

{¶112} "Q. Okay.

{¶113} "A. After we - - I mean we struggled with him for several minutes trying to get him to end the fight.

{¶114} "I believe I had to call back out after I said he had him secured because he continued to fight. He kept kicking, pushing up, trying to run.

{¶115} "Q. All right. Were you injured as a result of his actions during the arrest portion?

{¶116} "A. During the arrest, I mean I was sore afterwards. It was a pretty far run, I was tired.

**{¶117}** "Several days after I was sore. I wasn't sure if it was from the fighting or from the car accident, but nothing, nothing that kept me from working."

**{¶118}** Tr. at 195-197; 199-200; 202-205; 208-211.

**{¶119}** Officer Shackle of the Canton Police Department testified:

**{¶120}** "Can you tell us what happened to Car 37, the first car?

**{¶121}** "A. First cruiser - - this is going to be 30 eastbound.

**{¶122}** "As the Defendant went off the road here, Car 37 came up here and was paralleling him when the Defendant came back onto the road, struck the back end of the cruiser and spun it around.

**{¶123}** "Q. Okay. Where were you at that point?

**{¶124}** "A. At that point I was coming back onto the road as well because I had also gone onto the grassy area.

**{¶125}** "I had to come down this way to avoid getting hit by this cruiser right here, Officer Hastings, and then came back out around him.

**{¶126}** "After he hit him, I came up this way; and that's when the Defendant struck me on the rear driver's side door.

**{¶127}** "* * *

**{¶128}** "Q. Okay. After it hit the tree, what did you do?

**{¶129}** "A. After it hit the tree, I exited my cruiser through the driver's side door; and my partner exited the passenger side door.

**{¶130}** "We saw the driver of the SUV get out and run up onto Route 30, running eastbound onto Route 30.

{¶131} "I started to run up that way and then realized there was still a second person in the car, in the SUV. So I went back to the SUV.

{¶132} "Q. Now, at this time did the fact that you saw a suspect driver fleeing give you any safety concerns?

{¶133} "A. No.

{¶134} "Q. Did - -

{¶135} "A. Repeat - -

{¶136} "Q. Did the fact that you saw the suspect outside of the car give you any safety concerns?

{¶137} "A. Did he make me feel more safer or - -

{¶138} "Q. Did he give you concerns for your own safety?

{¶139} "A. Yes, it did.

{¶140} "Q. Okay. What were those concerns?

{¶141} "A. We were advised that it was a shooting, that somebody was shooting at a house.

{¶142} "We didn't know where the gun was at in the car, if there was even a gun in the car. We just were advised there was a shooting, so there was a gun supposed to be in play here.

{¶143} "Q. All right. And so you saw him going up Route 30 and then you came back to the cruiser?

{¶144} "A. Right.

{¶145} "Q. Who was the second person in the SUV?

{¶146} "A. That was a passenger, Jami Nosic.

{¶147} "Q. And what did you do?

{¶148} "A. He stayed in the SUV. He obeyed our commands to get out of the vehicle, lay down on the ground while we secured him in handcuffs."

{¶149} Tr. at 291; 293-295.

{¶150} Officer Premier of the Canton Police Department testified:

{¶151} "Q. Okay. Who was behind the suspect vehicle?

{¶152} "A. As the suspect vehicle pulled out, Car 37 which contained Officer Hastings was actually sitting at this stop sign on Gonder.

{¶153} "He turned eastbound, also, directly behind the suspect vehicle. Then Car 40 was behind Car 37. I was behind Car 40 and Car 43.

{¶154} "Q. Where did you go from there?

{¶155} "A. At that time Officer Hastings initiated his overheads and sirens, and we all followed suit.

{¶156} "Q. When you say you all followed suit, what do you mean?

{¶157} "A. We all turned on our lights and sirens, also.

{¶158} "The suspect vehicle seemed to be picking up a high rate of speed eastbound on Sherrick.

{¶159} "* * *

{¶160} "A. Yeah. So as we're heading off the road, he is going in a northeast direction, both of us.

{¶161} "I run over the gas pole. I go in the median to follow him. The Defendant's vehicle strikes the fence.

{¶162} "It is a chain link fence that keeps people from getting on the highway from points except for on ramps and off ramps.

{¶163} "He strikes that fence. The vehicle becomes airborne. He runs over approximately 60 – 70 feet of that fence.

{¶164} "The vehicle ends up - - there is a bush and there is a hill kind of going up to 77. That vehicle rides the fence for 60, 70 feet approximately.

{¶165} "Somehow makes it around this bush and stops right here next to a tree with the passenger door actually right up against a tree.

{¶166} "My vehicle stops about approximately 20 - 30 feet away from the Defendant's vehicle.

{¶167} "Car 40 is actually about right here past me. I think they pulled up after they were struck.

{¶168} "37 stays where it is with Officer Hastings.

{¶169} "At that time I - - do you need me to - -

{¶170} "Q. No, I just wanted to clarify. You mentioned Interstate 77. Is it just - -

{¶171} "A. Oh, did I state 77? I'm so sorry. It is Route 30.

{¶172} "Q. All right. At that point all the vehicles are at a stop?

{¶173} "A. At that time all vehicle are stopped.

{¶174} "Q. Did they go any further at that point.

{¶175} "A. No. None of these vehicles that are pictured here moved anymore from this point on.

{¶176} "Q. Okay. Why don't you take your seat. Thank you.

{¶177} "After the vehicles came to a stop, were you able to see behind you what anybody did?

{¶178} "A. I didn't look behind me at all.

{¶179} "Q. What did you do?

{¶180} "A. I exited the vehicle and immediately drew my duty weapon.

{¶181} "Q. And your duty weapon is a revolver - -

{¶182} "A. Yes, it is a semiauto .40 caliber Glock.

{¶183} "Q. It is a gun?

{¶184} "A. Yes.

{¶185} "Q. And what did you do?

{¶186} "A. I got myself in a comfortable shooting position because I expected the suspect to get out of the vehicle after everything has just transpired and to come out shooting is what I expected.

{¶187} "Q. And why did you expect that?

{¶188} "A. Because we initially, the call was a shots fired call.

{¶189} "Q. Okay. What happened?

{¶190} "A. I heard other officers - - I actually exited the vehicle. I had my duty weapon drawn. I heard other officers yelling commands.

{¶191} "I saw the suspect get out of the vehicle and immediately run northbound up the hill towards Route 30.

{¶192} "* * *

{¶193} "Q. When he began running, did you follow him and where to?

**{¶194}** "A. Yes, he ran up onto Route 30.  At that time I holstered my duty weapon and ran up the hill.

**{¶195}** "He actually ran accrossed [sic] Route 30 which is going to be the eastbound lane, ran acrossed [sic] it to the divider.

**{¶196}** "And when I first got up to the edge of the road, I kind of looked to make sure any traffic was coming.  I ran across the road.

**{¶197}** "I noticed that he - - I didn't make it across the road.  He jumped the divider first, and he disappeared; and I drew my duty weapon again.

**{¶198}** "* * *

**{¶199}** "Q. Let me stop you.  While this chase is going on down Route 30, were there cars coming?

**{¶200}** "A. I did see some cars coming from the on - - going eastbound.

**{¶201}** "At the time we were in the westbound lane when we were running down the middle of the divider, there was no - - or the middle lane, there was no cars at that time, that period of time.

**{¶202}** "Q. All right.  Now, you mentioned he gets to the overpass of Warner Road.

**{¶203}** "How high up is that overpass?

**{¶204}** "A. It appeared to be 25 to 30 feet.

**{¶205}** "Q. So it's, to Warner Road it is 25 to 30 feet.

**{¶206}** "A. Yes.

**{¶207}** "Q. All right.  What did the Defendant do at that point?

**{¶208}** "A. The Defendant appeared to be running towards the side as if he was going to jump.

**{¶209}** "Q. And what did you do in response to that?

**{¶210}** "A. At that time I drew my Taser which I carry in a leg holster on my left side. I drew it with my left hand and fired. I missed the Defendant.

**{¶211}** "Q. So the Ladies and gentlemen know, what is a Taser?

**{¶212}** "A. The Taser is just an electronic device that incapacitates your muscles and sends electrical charge into your body to cut the transmission of signals to your muscles and kind of make them freeze up.

**{¶213}** "Q. Have you been trained on the Taser?

**{¶214}** "A. Yes.

**{¶215}** "Q. And do you know if the Taser is lethal or deadly force or something less?

**{¶216}** "A. It is less than lethal.

**{¶217}** "Q. Okay. After you miss from firing the Taser, what happened?

**{¶218}** "A. At that time the Defendant turned around as if he knew the sound - - the Defendant turned around and began to, you know, swing wildly at myself.

**{¶219}** "Q. How close were you to him at that point?

**{¶220}** "A. By that time, because when I shot the Taser I was still running. I shot the Taser and I kept coming. Then he turned around and then we were hand to hand.

**{¶221}** "Q. What did he do to you?

**{¶222}** "A. We kind of clinched up. He was swinging like, you know, overhand.

{¶223} "Him and I, you know, I struck him several times trying to get him to the ground; and at that time I kind of felt a  big blast from behind where both of us had went over to the ground, and that was when Officer Hastings kind of tackled the group; and we both went down to the ground.  All three of us actually went down on the ground.

{¶224} "Q. Okay.  Where were you when the struggle began?

{¶225} "A. Right in the middle lane of Route 30.

{¶226} "Q. And how did you strike him?  How did you strike the Defendant?

{¶227} "A. I punched him in the face and, you know, tried to hit him in the chest as much as I could, what I could get without, you know, with his arms being in front of me.

{¶228} "Q. And what was your purpose in doing that?

{¶229} "A. I was trying to get him under control as quick as possible knowing that we were going to be fighting in the middle of a highway, a 3-lane highway.

{¶230} "Q. All right.  You mentioned then you are tackled by Officer Hastings and you all go down to the ground.

{¶231} "A. Yes.

{¶232} "Q. What happened next?

{¶233} "A. The Defendant did not, you know, just kept resisting.  We could not get cuffs on him.  We were taking elbows and everything else that he could put out.

{¶234} "You know, all we could do at that time because of being exhausted from running, we were - - I could just lay on him and try to get him, hold him down onto the ground to get the cuffs on him.

**{¶235}** "Q. All right.  Again, where were you at this point when you were attacked?

**{¶236}** "A. Still in the middle lane.

**{¶237}** "Q. Did the - - what eventually happened then?

**{¶238}** "A. We eventually got him cuffed.  We had to physically bring him to the side lane.  I believe after we actually had him to the side - -

**{¶239}** "Q. Let me stop you.  Side lane by - - what do you mean by side lane ?

**{¶240}** "A. I'm sorry.  It is actually the curb lane on the north, the furthest north side of the highway.

**{¶241}** "Q. So the curb next to the right-hand lane?

**{¶242}** "A. Yeah.

**{¶243}** "Q. Going westbound in this direction.  Okay.  What did you do then?

**{¶244}** "A. We actually - - at that time I actually had, my Taser was still on my - - it was actually stuck on my finger.  During the whole fight it was going off, but it was on my hand.

**{¶245}** "Q. Okay.

**{¶246}** "A. It wasn't actually being gripped by my hand.  It was actually stuck over my gloves on my hand.

**{¶247}** "Q. Okay.

**{¶248}** "A. You know, we got him in the cuffs.  I was able to pull that back off of my finger and reholster.

**{¶249}** "Q. What happened to the Defendant next?

{¶250} "A. We were able to cuff him and get him back, get him - - you know, he was very obstinate the whole time.

{¶251} "We were able to get him to his feet and walk him back across 30.

{¶252} "At that time, you know, like I said, there was cars actually coming in either direction at that time. I couldn't tell you how many, but we had to watch for them and try to flash our lights to slow them down.

{¶253} "Q. Now, you reached the median. Did you make it over the median okay?

{¶254} "A. To get over the median was difficult with him cuffed. He did not want to go over. He was leaning to either side making it very hard for us to get him back to the vehicle.

{¶255} "Q. Now, who was with you at this point other than the Defendant?

{¶256} "A. It was, it was myself, Officer Hastings, and then Officer Heslop had came up because, you know, Officer Hastings did state on the radio that the suspect was still fighting and we could not get him in cuffs.

{¶257} "* * *

{¶258} "Q. Now, did you suffer any injuries that night?

{¶259} "A. Yes. I had a - - after I got the suspect secured in the vehicle, I noticed that I had a tightness in my right hand.

{¶260} "When I took my glove off, it was swollen.

{¶261} "Q. All right. Did you go to the hospital for that?

{¶262} "A. Yes.

{¶263} "Q. Where did you go?

**{¶264}** "A. Aultman.

**{¶265}** "Q. And what was the result of your hospital visit?

**{¶266}** "A. It was a strain.

**{¶267}** "Q. And did the swelling eventually subside?

**{¶268}** "A. Yeah, later on that day."

**{¶269}** Tr. at 462-465; 468-474; 476-482; 488.

**{¶270}** Based upon the above, we find there is ample, competent, credible evidence to support Appellant's convictions for three counts felonious assault and resisting arrest, and the jury did not lose its way in finding Appellant guilty of the charges. The evidence was sufficient for the jury to find Appellant used his vehicle as a deadly weapon causing or attempting to cause the cruiser occupants physical harm. Appellant's first assignment of error is overruled.

II.

**{¶271}** Appellant's second assignment of error argues he was denied the effective assistance of counsel. Appellant asserts his counsel's overall performance in representing him fell below the acceptable standard. Specifically, Appellant claims his trial counsel failed to obtain the Bill of Particulars despite having requested the same from the State, was not prepared for trial, missed two pretrials, and his overall performance fell below the objective standard for reasonableness.

**{¶272}** A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry in whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced

by counsel's ineffectiveness. *Lockhart v. Fretwell* (1993), 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

**{¶273}** In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Bradley,* 42 Ohio St.3d at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. *Id.*

**{¶274}** In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing counsel's errors were so serious as to deprive the defendant of a fair trial; a trial whose result is reliable. *Strickland* 466 U.S. at 687, 694, 104 S.Ct. at 2064; 2068. The burden is upon the Appellant to demonstrate that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.; Bradley,* supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* supra; *Bradley,* supra.

**{¶275}** The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, 538 N.E.2d 373, quoting *Strickland* at 697. Accordingly, we will direct our attention to the second prong of the *Strickland* test.

{¶276} Appellant has not satisfied either prong of *Strickland*. As set forth in our analysis and disposition of Appellant's first assignment of error, the evidence presented at trial was sufficient to convict Appellant of the charges, and Appellant has not demonstrated that but for counsel's presumed errors the outcome of the trial would have been otherwise. Appellant conclusively presumes but for Appellant's alleged errors he would not have been convicted of the charges, and has not demonstrated had counsel been more adequately prepared or had counsel received the Bill of Particulars, the outcome of the trial would have been different.

{¶277} Based upon the foregoing, Appellant's second assignment of error is overruled.

III.

{¶278} In the third assignment of error, Appellant maintains the trial court's imposition of consecutive sentences is an abuse of discretion.

{¶279} In *State v. Kalish,* 120 Ohio St.3d 23, 2008–Ohio–4912, the Supreme Court of Ohio set forth the following two-step approach in reviewing a sentence:

{¶280} "In applying *Foster [State v.,* 109 Ohio St.3d 1, 2006–Ohio–856] to the existing statutes, appellate courts must apply a two-step approach. First, they must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision shall be reviewed under an abuse-of-discretion standard."

**{¶281}** In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore* (1983) 5 Ohio St.3d 217.

**{¶282}** We note although in *Oregon v. Ice* (2009), 555 U.S. 160, the United States Supreme Court upheld the constitutional validity of an Oregon statute similar to Ohio's pre- *Foster* sentencing statutes, the Supreme Court of Ohio in *State v. Hodge,* 128 Ohio St.3d 1, 2010–Ohio–6320, held the *Oregon* case did not revive the *Foster* statutes, and trial courts are not obligated to engage in judicial fact-finding prior to imposing consecutive sentences.

**{¶283}** At the sentencing hearing in this matter, the Court stated on the record,

**{¶284}** "Ah, but as I hand down this sentence, I will say for the record that, Mr. Latimore, as I watched this testimony throughout the trial, I'm not sure that you grasp the concept that when police officers leave their house every night, they don't know whether they are going to make it home or not.

**{¶285}** "It's a serious job. Carries a lot of risk.

**{¶286}** "And what I watched in this trial was a conscious disregard by you. I mean, I watched you drive into vehicles of police that were chasing you; I watched you run through stop signs, where someone innocent could have gotten killed. At no point did you stop.

**{¶287}** "And when I balance your conduct in this courtroom, your conduct, ah, disrespect - - and I've made it very clear in my courtroom, anybody that disrespects police officers, there is going to be a price to pay.

**{¶288}** "So I'm going to issue the following sentence: On count one, felonious assault, felony of the first degree, I'm going to sentence you to a prison term of five years.

**{¶289}** "Count two, felonious assault, felony of the first degree, I'm going to sentence you to prison term of five years, to be served consecutive with count one.

**{¶290}** "Count three, felonious assault, felony of the first degree, I'm going to sentence you to a prison term of five years, consecutive with counts one and two.

**{¶291}** "Count four, the felonious assault, you were found not guilty.

**{¶292}** "Count five, failure to comply with an order or signal of a police officer, I'm gonna, ah, sentence you to a period of two years, consecutive with one, two and three.

**{¶293}** "Count six, resisting arrest, ah, 60 days, concurrent with count one.

**{¶294}** "So I want to make it very clear to you you are going to be incarcerated for a period of 17 years.

**{¶295}** "I'm also going to order restitution to the Canton Police Department of $14,027.97.

**{¶296}** "Now, I also have to advise you of what's called post-release control. These four, or these three felonious assaults carry a mandatory post-release control of five years."

**{¶297}** Tr. at 9-11.

**{¶298}** Upon review, Appellant's sentence is within the guidelines and statutory parameters, and the trial court did not abuse its discretion in imposing consecutive sentences. The third assignment of error is overruled.

**{¶299}**  Appellant's conviction and sentence in the Stark County Court of Common Pleas is affirmed.

By: Hoffman, J.

Gwin, P.J.  and

Edwards, J. concur

s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ W. Scott Gwin_____
HON. W. SCOTT GWIN


s/ Julie A. Edwards_____
HON. JULIE A. EDWARDS

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| JAMES LATIMORE | : | |
| | : | |
| Defendant-Appellant | : | Case No. 2010CA00226 |

For the reasons stated in our accompanying Opinion, Appellant's conviction and sentence in the Stark County Court of Common Pleas is affirmed.  Costs to Appellant.


s/ William B. Hoffman
HON. WILLIAM B. HOFFMAN


s/ W. Scott Gwin
HON. W. SCOTT GWIN


s/ Julie A. Edwards
HON. JULIE A. EDWARDS